UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOHN STEWART,

                Plaintiff,

    v.

PROMETRIC LLC,

                Defendant.

CASE NO. C19-1362JLR

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Before the court is Defendant Prometric LLC's ("Prometric") motion for summary judgment.  (Mot. (Dkt. # 24); *see also* Reply (Dkt. # 38).)  Plaintiff John Stewart opposes Prometric's motion.  (Resp. (Dkt. # 34).)  The court has considered the motion, the parties' submissions regarding the motion, the relevant portions of the record, and the

//

//

//

1  applicable law.[1]  Being fully advised, the court DENIES Prometric's motion for summary

2  judgment.

3  ## II.    BACKGROUND

4        Mr. Stewart, a former Prometric Nurse Aide Evaluator ("NAE"), alleges that

5  Prometric disciplined and terminated him in retaliation for complaining about national

6  origin discrimination against individuals seeking to become licensed home health care

7  aides who took a Somali-translated version of the Washington State Home Health Care

8  Aide Examination ("HCAE"), which Prometric developed and administered.  (*See*

9  *generally* Compl. (Dkt. # 1-2).)  The court recounts the factual and procedural

10  background of this case below.

11  **A.    Factual Background**

12        The events at issue in Mr. Stewart's lawsuit span from late 2017 to September

13  2018.  The court first describes the parties involved and then reviews the series of events

14  leading up to Mr. Stewart's discipline and termination.

15        1.    The Parties

16        Prometric is a "leading provider of technology-enabled testing and assessment

17  solutions to many of the world's most recognized licensing and certification

18  organizations, academic institutions, and government agencies."  (Lawson Decl. (Dkt.

19  # 29) ¶ 3.)  The Washington State Department of Health ("DOH") contracts with

20  //

21

22  ────────────────────
[1] Neither party requests oral argument (*see* Mot., Resp.), and the court finds oral
argument unnecessary to its disposition of the motion, *see* Local Rules W.D. Wash. LCR 7(b)(4).

1  Prometric to develop and administer the HCAE.[2]  (*Id.* ¶ 4.)  Although Prometric is

2  administers the exam, DOH owns the exam's content.  (Mulford Decl. (Dkt. # 31) ¶ 7.)

3     The HCAE consists of two parts:  a computer-based knowledge exam and a skills

4  exam.  (Lawson Decl. ¶ 10.)  The knowledge portion of the exam consists of true/false

5  and multiple-choice questions, while the skills exam requires examinees to physically

6  demonstrate home care aide skills.  (*Id.*)  During the knowledge portion, test-takers can

7  either use a written version of the test or listen to an audio file that reads the questions

8  and corresponding answer choices out loud.  (*Id.*)  At DOH's direction, Prometric worked

9  with an outside vendor to translate the knowledge portion of the HCAE into languages

10  other than English.  (*Id.* ¶ 11.)  The HCAE is currently available in 14 languages,

11  including Somali.  (*Id.*)  The HCAE is proctored by a Prometric NAE, who is the only

12  employee in the room with the candidates during the exam.  (*Id.* ¶ 10.)

13     Mr. Stewart began working for Prometric on May 12, 2015 as an NAE

14  administering the HCAE to home care aide candidates in Washington.  (*See* Mulford

15  Decl. ¶¶ 11, 14.)  As an NAE, he was required to comply with the terms of Prometric's

16  Code of Business Conduct & Ethics (*id.* ¶ 8, Ex. B); its Acceptable Use Policy for

17  computer systems and email (*id.* ¶ 10, Ex. C); its Nurse Aid Policy Guide (*id.* ¶ 11,

18  Ex. D); and a Confidentiality Agreement (*id.* ¶ 13, Ex. E).  Prometric terminated his

19  employment on September 29, 2018.  (Thompson Decl. (Dkt. # 26) ¶ 17.)

20

21   [2] The contract between Prometric and DOH contains certain confidentiality provisions
that Prometric interprets as limiting its ability to share data such as pass rates, exam content, and
candidate information including names and contact information.  (*Id.* ¶¶ 5-6; *see also id.* Ex. A

22  (contract between Prometric and DOH); Mulford Decl. (Dkt. # 31) ¶ 7.)

1    2.    Mr. Stewart's 2017 Discipline

2    In December 2017, Mr. Stewart's supervisor, Corwin Sample, gave Mr. Stewart a

3    written warning for giving an examinee an unauthorized testing accommodation—

4    specifically, allowing the examinee to use an interpreter without prior approval.

5    (Mulford Decl. ¶ 22, Ex. L; *see also id.*, Ex. M.)  The warning stated that

6        disregard for [Prometric's] interests may result in termination of employment
         . . . .    This notice does not create entitlement to progressive discipline and
7        we reserve our rights as an at-will employer, including our right to terminate
         your employment at any time with or without cause or prior notice.

8    (*Id.*, Ex. L at 2.)  Mr. Stewart replied to the written warning by email to Mr. Sample,

9    copying Human Resources Director Pam Thompson and Mr. Sample's supervisor, Nancy

10   Patterson.  (*Id.*, Ex. M.)  He wrote that the decision to issue him a written warning was "a

11   significant waste of time for all concerned" because he was not aware that providing the

12   accommodation was a "serious issue."  (*Id.*)

13   3.    Mr. Stewart's Concerns about Somali Examinees' Pass Rates

14   The next month, in January 2018, Mr. Stewart became concerned about Somali

15   test-takers' low pass rates on the HCAE knowledge test.  (O'Laughlin Decl. (Dkt. # 35) ¶

16   5, Ex. D ("Stewart Dep.") at 136:8-15.)  He had observed a pattern of Somali examinees

17   doing well on the skills test but failing the knowledge test.  (*Id.* at 137:4-18.)  Mr. Stewart

18   discussed his concerns with other NAEs and Mr. Sample.  (*See* Lawson Decl. ¶ 16.)

19   On March 14, 2018, Mr. Stewart sent an email to Mr. Sample in which he

20   expressed his concern that Somali candidates were failing the knowledge test due to a

21   problematic translation of its content.  (Stewart Decl. (Dkt. # 36) ¶ 3, Ex. M at 3.)  In

22

1   response, Mr. Sample directed him to gather data about Somali candidates' pass rates.

2   (*Id.* at 2-3.)  Mr. Stewart obtained a pass-rate report from a Prometric operations

3   employee and forwarded the report to Mr. Sample.  (*See id.* ¶¶ 4-6, Exs. N-P.)  In his

4   email, Mr. Stewart observed that the Somali-translated test had the lowest pass rate of

5   any of Prometric's supported languages.  (*See id.*)  In April 2018, Mr. Sample informed

6   Mr. Stewart in a conference call that Prometric did not intend to address the Somali

7   translation of the knowledge test because it would be too costly.  (Stewart Dep. at 139:8-

8   16, 140:10-22.)

9       4.    <u>Mr. Stewart's Call to DOH and Verbal Warning</u>

10         Mr. Stewart remained concerned about the Somali candidates' low pass rates.  On

11   July 23, 2018, Mr. Stewart called Stacy Saunders, DOH's Program Director for the

12   Health Systems Quality Assurance Division and Prometric's primary point of contact at

13   DOH, to report his concerns about the Somali-language test.  (*See* Mulford Decl. ¶ 16;

14   Lawson Decl. ¶ 7; Saunders Decl. (Dkt. # 30) ¶ 5.)  He identified himself only as "John"

15   in the call.  (Saunders Decl. ¶ 6.)

16         On July 24, 2018, Ms. Saunders reported the conversation to Stacy Lawson, the

17   account manager for Prometric's account with DOH.  (Lawson Decl. ¶ 7.)  Ms. Lawson

18   quickly determined that "John" was Mr. Stewart.  (*See id.*)  Ms. Lawson informed Mr.

19   Sample, Ms. Thompson, and Client Success Manager Vicki Simmons about Mr.

20   Stewart's call to Ms. Saunders.  (*Id.*, Ex. D.)  In her email, Ms. Lawson noted that Ms.

21   Saunders was "questioning [Mr. Stewart's] objectivity" and that she "needs assurance

22

that he's not compromising the exam." (*Id.*)  Ms. Lawson wrote that she informed Ms.

Saunders that Prometric would "launch an internal investigation." (*Id.*)

On July 25, 2018, Mr. Sample and Ms. Thompson called Mr. Stewart to issue him

a verbal warning (the "July 25 verbal warning").  (Stewart Dep. at 146:6-147:5.)  They

informed him that he did a "bad thing" by contacting a client without permission and

suspended him with pay for two weeks pending an investigation.  (*Id.*)  According to Mr.

Stewart, Mr. Sample and Ms. Thompson did not tell him during the call to stop collecting

information about the Somali-language test.[3]  (*Id.* at 149:4-9.)

Although Prometric disciplined and suspended Mr. Stewart for contacting DOH

about his concerns, Ms. Lawson acknowledged in her deposition that it was appropriate

for complaints about the HCAE to go to DOH.  (O'Laughlin Decl. ¶ 4, Ex. C ("Lawson

Dep.") at 31:8-14, 22-25.)  In addition, Prometric has not identified any written policy

that prevents an employee from escalating concerns about a test to a government agency

client.  (*See, e.g.*, Mulford Dep. at 36:11-13.)

After issuing the verbal warning, Prometric launched an investigation into Mr.

Stewart's "objectivity or the lack thereof."  (Lawson Dep. at 34:19-35:4.)  After

reviewing data about his candidates' pass rates (*id.* at 40:5-7), Prometric was "confident"

that Mr. Stewart could "perform his duties appropriately" and returned Mr. Stewart to

---

[3] Ms. Thompson did not recall during her deposition whether she and Mr. Sample had so
instructed him.  (Thompson Dep. at 19:7-20; 35:4-10; 39:17-23.)  She states in her declaration,
however, that she must have instructed Mr. Stewart to stop compiling test data because she
suggested to Ms. Mulford that she include that fact in a final written warning issued to Mr.
Stewart on August 24, 2018.  (Thompson Decl. (Dkt. # 26) ¶ 8.)  There is no testimony or
declaration from Mr. Sample in the record before the court.  (*See* Dkt.)

1    work (Thompson Decl. ¶ 10).  According to Mr. Stewart, when Mr. Sample called him to

2    return to work, he told Mr. Stewart what a "great employee" he was and that Prometric

3    needed him.  (Stewart Dep. at 159:6-11.)  Mr. Stewart, however, declined to return to

4    work before the end of his two-week paid suspension.  (*See* Thompson Decl. ¶ 10.)

5    Prometric viewed Mr. Stewart's refusal to return to work as insubordination but did not

6    discipline him for it.  (*Id.*)

7        5.    Mr. Stewart's August 14 Email and Final Written Warning

8        On August 14, 2018, shortly after he returned to work from his suspension, Mr.

9    Stewart emailed Mr. Sample and Ms. Thompson to express his continuing concern that

10   the discrepancy in pass rates between Somali-language test-takers and candidates taking

11   the test in other languages was not being addressed.  (O'Laughlin Decl. ¶ 12, Ex. K-19

12   ("August 14 email").[4])  He wrote that he was convinced, based on "evidence" including

13   comments from candidates and interpreters about the exam, that the discrepancy in pass

14   rates was due to a problematic translation.  (*Id.*)  He expressed his belief that the test was

15   "fundamentally unfair" as a result.  (*Id.*)  Prometric's Vice President of Legal Affairs

16   Allison Mulford testified that she agreed that this email raised an issue of potential

17   national origin discrimination.  (Mulford Dep. at 40:7-41:17.)

18       Ms. Thompson interpreted Mr. Stewart's email as indicating that he had continued

19   to investigate the Somali pass-rate discrepancy after his verbal warning.  (Thompson

20

21       [4] Exhibit K to the O'Laughlin Declaration contains multiple documents that were marked
     as exhibits during the depositions in this case.  (O'Laughlin Decl. ¶ 12.)  Documents within this
     exhibit are labeled with the deposition exhibit number prefixed with the letter "K."  (*Id.*)  For
22   example, the August 14 email is deposition exhibit 19.  (*See id.*)

Decl. ¶ 11.)  She escalated Mr. Stewart's email to Ms. Patterson and Ms. Mulford.  (*Id.*)  Ms. Mulford, too, inferred from Mr. Stewart's email that he had continued to collect evidence of discrimination after receiving the July 25 verbal warning.  (Mulford Dep. at 42:22-43:7.)  Neither Ms. Mulford nor Ms. Thompson spoke with Mr. Stewart about their concerns or determined whether Mr. Stewart had in fact continued to gather evidence.  (*See id.* at 43:25-44:5; Thompson Dep. at 48:20-23.)

Although Ms. Mulford was not ordinarily involved in Prometric's disciplinary process (*see* Mulford Dep. at 14:14-16), she drafted a final written warning letter for Mr. Stewart (Mulford Decl. ¶ 25).  Ms. Mulford later testified at Mr. Stewart's unemployment hearing that she was asked to assist with the written warning because Mr. Stewart "wasn't able to drop the issue" of the Somali-language tests and "kept raising it internally to the same individuals."  (Mulford Dep. at 46:6-49:13.)

On August 24, 2018, Ms. Mulford emailed the final written warning to Mr. Stewart, noting that the warning was in response to his August 14 email.  (O'Laughlin Decl. Ex. K-20 (the "August 24 final written warning") at 1.)  Ms. Mulford wrote that Mr. Stewart should consider the letter "a final notice to you to cease and desist from any further compilation of data, documents, or materials related to" the issue of the Somali-language test.  (*Id.* at 2.)  She explained Prometric's procedures for developing the Somali-language exam; informed Mr. Stewart that the low pass rate that he quoted in his August 14 email was not up to date and was not based on a statistically significant sample size; and described the relationship between Prometric and DOH with respect to test development.  (*Id.* at 2-4.)  She also explained that DOH had raised "grave issues of

1    concern" that Mr. Stewart had a "perceived conflict of interest" in his duties as an NAE.

2    (*Id.* at 4.)  Ms. Mulford informed Mr. Stewart that he was "strictly prohibited" from

3    possessing any materials aside from those provided in the company's Nurse Aide

4    Evaluator Manual and that his possession of anything that contained candidate or

5    employee personal data was considered a data privacy breach.  (*Id.*)  She instructed Mr.

6    Stewart "to immediately return everything, with the exception of the Nurse Aid Evaluator

7    Manual, that is either Prometric or [DOH] property, confidential or proprietary material,

8    or research/data that you have compiled from the same including but not limited to data,

9    documents, and/or materials" by August 27, 2018.  (*Id.* at 4-5.)  In the alternative, Mr.

10   Stewart could provide written confirmation that he had destroyed those materials.  (*Id.* at

11   5.)  Finally, highlighting both his December 22, 2017, written warning and his conduct

12   regarding the Somali-language exam, Ms. Mulford warned Mr. Stewart that "any other

13   infractions of company policies or procedures, even if unrelated to this issue" would be

14   "grounds for immediate termination."  (*Id.*)

15          On August 27, 2018, Mr. Stewart emailed Ms. Mulford to seek clarification of the

16   policies and directives described in her letter.  (O'Laughlin Decl. Ex. K-21 at 2-3.)  He

17   stated that he did not think he had received a verbal warning prohibiting him from data-

18   gathering and compilation; rather, he understood that the July 25 verbal warning to be

19   about never contacting a client.  (*Id.*)  He asserted that he was not compiling any data or

20   documents and that to his knowledge, he did not have any materials that he was not

21   supposed to have.  (*Id.*)

22

1   Ms. Mulford responded on August 30.  She wrote that Mr. Stewart "should not

2   ever be in possession of pass rates, or solicit or compile feedback about a specific exam

3   from other proctors or candidates."  (*Id.* at 1-2.)  She told him that he was to destroy

4   and/or turn over the "evidence" that he referred to in his August 14 email, including any

5   exam pass rates.  (*Id.* at 2.)  Later that day, Mr. Stewart responded that he was not aware

6   that the pass rates were confidential or proprietary and that he had deleted the copy of the

7   pass-rates document that was saved on his computer.  (*Id.*)  Mr. Stewart did not

8   understand Ms. Mulford's directive to require him to also review his email and delete all

9   emails that included pass rate information.  (Stewart Dep. at 193:11-194:2.)

10   6.   Mr. Stewart's Termination and Subsequent Events

11   In September 2018, Mr. Stewart consulted an attorney about his concerns.

12   (Stewart Decl. ¶ 11.)  The attorney advised him to forward relevant work emails to his

13   personal email account to preserve evidence of discrimination and retaliation.  (*Id.*)  At

14   least one of the emails, sent on September 16, included the pass-rate document that Mr.

15   Stewart had told Prometric he had deleted.  (Stewart Dep. at 208:8-13.)  Prometric

16   learned that Mr. Stewart was forwarding emails to his personal account because he had

17   accidentally "replied all" to one of the emails, sending it to Ms. Thompson, Ms. Mulford,

18   and Ms. Patterson.  (Thompson Decl. ¶ 14.)  Subsequently, during an audit of Mr.

19   Stewart's emails, Prometric learned that he had forwarded multiple company emails to

20   himself and to the attorney he had consulted.  (*Id.*; *see also id.*, Ex. C (copies of

21   forwarded emails).)

22

On September 17, 2018, Mr. Stewart emailed Ms. Patterson, Ms. Mulford, and Ms. Thompson that he had "refrained from all gathering of data and complaints regarding the Somali Knowledge Test, as directed." (O'Laughlin Decl. Ex. K-25 (the "September 17 email").) He again expressed his concern that "the pass rate disparities might demonstrate a testing flaw that targets and harms a minority foreign born ethnic group of Somali speakers" and his belief that corrective action was needed. (*Id.*)

After Prometric completed its audit of Mr. Stewart's email, Ms. Patterson, Ms. Mulford, and Ms. Thompson agreed that Prometric should terminate Mr. Stewart for violating the final written warning and for lying to Prometric about deleting pass-rate data. (Thompson Decl. ¶ 14.) On September 26, 2018, Ms. Thompson drafted a Termination Request seeking authorization to terminate Mr. Stewart's employment and sent the request to Mr. Sample and Ms. Patterson. (O'Laughlin Decl. Ex. K-82.) According to Ms. Thompson's Termination Request, the "last straw" was that Mr. Stewart had "not been truthful about his retention of information that Prometric considers to be confidential information owned by the [DOH]" and had "forwarded the information in violation of company policy and prior instructions from legal counsel to an external, personal account." (*Id.* at 2.) It notes that the risk Mr. Stewart might sue the Prometric as a result of his termination "is high due to John's predisposition for escalating issues to regulators and legal counsel despite the fact that he is not in possession of all of the facts, information and experience necessary to reach an informed conclusion." (*Id.*; *see also* Thompson Decl. ¶ 15 (explaining Ms. Thompson's risk assessment).) Kewin Gales,

1  Prometric's Senior Vice President of Global Human Resources, made the final decision

2  to terminate Mr. Stewart's employment.  (Gales Decl. (Dkt. # 27) ¶ 3.)

3    On September 28, 2018, Ms. Patterson issued a written warning to Mr. Sample for

4  directing Mr. Stewart to access and review the Somali candidates' test results and for

5  allowing the NAEs to discuss exam content with one another via email.  (Patterson Decl.

6  (Dkt. # 28) ¶ 11; Mulford Decl. ¶ 34, Ex. Y.)  The next day, Ms. Thompson and Mr.

7  Sample met with Mr. Stewart to inform him that Prometric was terminating his

8  employment.  (*See* O'Laughlin Decl. Ex. K-83.)  Ms. Thompson wrote in a follow-up

9  email to Prometric management that she explained the "termination points including [Mr.

10  Stewart] not being truthful about his retention of confidential information and sending

11  company emails to exter[]nal recipients."  (*Id.*)  Mr. Stewart, however, was still an

12  employee of Prometric when he forwarded the emails to himself, and Ms. Mulford

13  acknowledged that there "wasn't an issue with [Mr. Stewart] sending things to attorneys."

14  (Mulford Dep. at 143:1-7.)

15    In January 2019, Ms. Saunders emailed Prometric a formal request to stop using

16  the then-current Somali HCAE and revert to the prior version of the exam.  (Thompson

17  Decl. ¶ 22; *id.*, Ex. F; O'Laughlin Decl. Ex. K-94.)  DOH reached out to the Somali

18  Health Board, who reviewed the version of the HCAE that had been used in 2018 and

19  expressed concerns with the quality of the oral and written translations.  (*See* O'Laughlin

20  Decl. Ex. K-95 (email from Ms. Saunders to Ms. Lawson.)  After Prometric reverted to

21  the prior version of the exam, the Somali examinees' pass rate increased.  (*Id.*)

22

1  **B.    Procedural Background**

2          On July 29, 2019, Mr. Stewart filed a complaint in King County Superior Court

3  alleging a claim for retaliation in violation of the Washington Law Against

4  Discrimination ("WLAD"), ch. 49.60 RCW.  (Compl. at 1, 6-7.)  On August 28, 2019,

5  Prometric removed the case to this court on the basis of diversity because Prometric is a

6  Delaware corporation with its principal place of business in Baltimore, Maryland.  (*See*

7  Not. of Removal (Dkt. # 1).)  Prometric now moves for summary judgment on Mr.

8  Stewart's sole claim.  (*See generally* Mot.)

9                          **III.    ANALYSIS**

10  **A.    Summary Judgment Standard**

11          Summary judgment is appropriate if the evidence viewed in the light most

12  favorable to the non-moving party shows "that there is no genuine dispute as to any

13  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

14  56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Beaver v. Tarsadia Hotels*,

15  816 F.3d 1170, 1177 (9th Cir. 2016).  A fact is "material" if it might affect the outcome

16  of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute

17  is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the

18  non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001)

19  (citing *Anderson*, 477 U.S. at 248-49).

20          The moving party bears the initial burden of showing there is no genuine dispute

21  of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

22  323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

1   show the absence of such a dispute in two ways:  (1) by producing evidence negating an

2   essential element of the nonmoving party's case, or (2) by showing that the nonmoving

3   party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

4   *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

5   meets its burden of production, the burden then shifts to the nonmoving party to identify

6   specific facts from which a factfinder could reasonably find in the nonmoving party's

7   favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

8        The Ninth Circuit has provided additional guidance for when an employer brings a

9   motion for summary judgment in an employment discrimination case.  Such motions

10   must be carefully examined in order to "zealously guard an employee's right to a full

11   trial, since discrimination claims are frequently difficult to prove without a full airing of

12   the evidence and an opportunity to evaluate the credibility of the witnesses."  *Weil v.*

13   *Citizens Telecom Servs. Co.*, 922 F.3d 993, 1002 (9th Cir. 2019) (quoting *McGinest v.*

14   *GTE Service Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) (internal quotation marks

15   omitted)).  This high standard means that an employee needs "very little evidence" to

16   survive summary judgment in a discrimination case "because the ultimate question is one

17   that can only be resolved through a 'searching inquiry' – one that is most appropriately

18   conducted by the factfinder, upon a full record."  *Schnidrig v. Columbia Mach., Inc.*, 80

19   F.3d 1406, 1410 (9th Cir. 1996) (quoting *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1563 (9th

20   Cir. 1994)). Indeed, "any indication of discriminatory motive may suffice to raise a

21   question that can only be resolved by a factfinder."  *Weil*, 922 F.3d at 1002 (quoting

22   *Schnidrig*, 80 F.3d at 1409) (internal quotation marks and edits omitted)).

**B.     Retaliation under the WLAD**

The WLAD prohibits an employer from retaliating against an employee for opposing any discriminatory practice forbidden under that statute.  RCW 49.60.210.  To prove a claim of retaliation under the WLAD, an employee must show (1) that he took a statutorily protected action, (2) that he suffered an adverse employment action, and (3) a causal link between his protected activity and the adverse employment action.  *See Cornwell v. Microsoft Corp.*, 430 P.3d 229, 234 (Wash. 2018).

Washington has adopted the three-step evidentiary burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for evaluating motions for summary judgment on retaliation claims that rely on circumstantial evidence.[5]  *Cornwell*, 430 P.3d at 234 (citing *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 404 P.3d 464, 470 (Wash. 2017)).  First, an employee must make a prima facie case of retaliation by showing (1) that he took a statutorily protected action; (2) that he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action.  *Id.*  Where the employee establishes a prima facie case, a rebuttable presumption of retaliation exists.  *Mackey v. Home Depot USA, Inc.*, --- P.3d ---, 12 Wn. App. 2d 557, 571 (Wash. Ct. App. 2020) (citing *Mikkelsen*, 404 P.3d at 470).

//

//

---

[5] Because the court concludes, as discussed below, that Mr. Stewart has met his burden on summary judgment under *McDonnell Douglas*, the court does not analyze whether he has also met his summary judgment burden based on direct evidence of retaliation.  *See infra* § III.C.

1  Second, the burden shifts to the employer, who must articulate a legitimate,

2  nonretaliatory reason for taking the adverse action against the employee.  *Id.* (citing

3  *Mikkelsen*, 404 P.3d at 470).  The employer is not required to persuade the court that it

4  was actually motivated by the nonretaliatory reason.  *Id.*  Rather, the employer need only

5  show that its evidence, if taken as true, would permit the conclusion that there was a

6  nondiscriminatory reason.  *Id.* at 571-72.

7        Third, if the employer meets this burden, the employee must produce sufficient

8  evidence to show that the employer's alleged nonretaliatory reason for the discharge was

9  a "pretext."  *Id.*  "An employee may satisfy the pretext prong by offering sufficient

10 evidence to create a genuine issue of material fact either (1) that the defendant's reason is

11 pretextual or (2) that although the employer's stated reason is legitimate, [retaliation]

12 nevertheless was a substantial factor motivating the employer."  *Scrivener v. Clark Coll.*,

13 334 P.3d 541, 446 (Wash. 2014).  Because an employer's decision may be based on both

14 legitimate and illegitimate reasons, the employee is not required to show that retaliation

15 was the only motivating factor for the discharge.  *See id.*

16 **C.    Prometric's Motion for Summary Judgment**

17        For purposes of its motion, Prometric does not dispute that Mr. Stewart has

18 satisfied his burden at the first *McDonnell Douglas* step to demonstrate a prima facie case

19 of retaliation.  (Mot. at 20 n.18.)  Instead, Prometric contends that it has met its burden on

20 the second step to produce evidence of legitimate, nonretaliatory reasons for Mr.

21 Stewart's termination (*id.* at 21-22), and that Mr. Stewart cannot meet his ultimate burden

22 at the third step to show that those reasons were pretextual (*id.* at 22-24).  Mr. Stewart

1   responds that Prometric's representation of the scope of his protected activity and its own

2   adverse actions is too narrow (Resp. at 15-18); that Prometric cannot meet its burden on

3   the second step of the *McDonnell Douglas* framework to produce evidence of a

4   legitimate nonretaliatory reason for his discipline termination (*id.* at 19-21); and that he

5   meets his third-step burden to show that Prometric's cited reasons for his discipline and

6   termination are pretextual (*id.* at 21-24).

7        Mindful of the Ninth Circuit's admonitions regarding summary judgment in

8   employment discrimination cases, the court concludes that Mr. Stewart has met his

9   burden to demonstrate that there are genuine issues of fact regarding whether Prometric's

10  decisions to discipline and terminate him was retaliatory, and therefore DENIES

11  Prometric's motion for summary judgment.  The court now addresses each step of the

12  *McDonnell Douglas* framework.

13        1.    Prima Facie Case

14        Although Prometric does not dispute, for the purposes of this motion, that Mr.

15  Stewart has made out a prima facie case of retaliation under step one of the *McDonnell*

16  *Douglas* framework (Mot. at 20 n.18), the parties disagree on the scope of Mr. Stewart's

17  protected activity and Prometric's adverse actions (*see* Resp. at 15-18).  Because the

18  parties do not dispute the causation prong of the prima facie case in their briefing (*see*

19  Mot., Resp.), the court focuses on the protected activity and adverse action prongs.  The

20  court concludes that Mr. Stewart has met his burden to make out a prima facie case under

21  the expanded scope he sets forth in his response.

22

1                          *a.     Protected Activity*

2              An employee who opposes employer practices that he or she reasonably believes

3      to be discriminatory is protected by the WLAD, even if the employer's practice is not in

4      fact discriminatory. *Renz v. Spokane Eye Clinic, P.S.*, 60 P.3d 106, 110 (Wash. Ct. App.

5      2002) (citing *Graves v. Dep't of Game*, 887 P.2d 424, 428 (Wash. Ct. App. 1994)).

6              The parties do not dispute for the purposes of this motion that Mr. Stewart

7      engaged in protected activity when he complained about the Somali candidates' low pass

8      rates to the DOH in July 2018.  (Resp. at 15; *see* Reply at 8.)  Mr. Stewart, however,

9      argues that he also engaged in activity protected under the WLAD when he complained

10     about discrimination against the Somali test-takers in his August 14 and September 17

11     emails and when he forwarded emails containing pass-rate and other information that he

12     considered to be evidence of discrimination to his personal email account and to his

13     attorney.  (Resp. at 15-16 (citing *Selberg v. United Pac. Ins. Co.*, 726 P.2d 468, 469

14     (Wash. Ct. App. 1986), *abrogated on other grounds by Allison v. Hous. Auth. of City of*

15     *Seattle*, 799 P.2d 1195 (Wash. 1990)).)  Viewing the evidence in the light most favorable

16     to Mr. Stewart, the court agrees that a jury could reasonably conclude that this conduct is

17     protected activity.

18             First, both Mr. Stewart's August 14 and September 17 emails to Prometric

19     managers note his concerns about the low pass rates associated with the Somali

20     knowledge exam.  (*See* O'Laughlin Decl. Exs K-19, K-25.)  Indeed, Ms. Mulford

21     acknowledged that the August 14 email raised an issue of potential national origin

22     discrimination (*see* Mulford Dep. at 40:7-41:17), and Mr. Stewart's September 17 email

expressly notes his concern about harm to a minority group (*see* O'Laughlin Decl. Ex. K-25).  A jury could reasonably find that these emails were protected activity.

Second, an employee's preservation of evidence of discrimination may be protected opposition activity.  *See Selberg*, 726 P.2d at 469-71 (finding plaintiff's act of removing and copying documents that he alleged supported his allegations of age discrimination could be oppositional activity under the WLAD); *see also Kempcke v. Monsanto Co.*, 132 F.3d 442, 445 (8th Cir. 1998) (recognizing employee who gave documents to his lawyer, refused to return them, and told his employer to speak to his lawyer arguably engaged in protected activity under the federal discrimination law);[6] *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) (holding that an employee with a good faith reason to believe his employer is engaged in unlawful discrimination has a legitimate interest in preserving evidence of his employer's unlawful employment practices).  The court agrees with Mr. Stewart that a jury must decide whether he engaged in protected oppositional activity by forwarding the emails to himself and his attorney.

Prometric argues that even if Mr. Stewart's August 14 and September 17 emails to his managers and his September 2018 emails to his external account[7] could be considered oppositional activity, they are not protected under the WLAD because Mr. Stewart's

---

[6] Washington courts look to federal antidiscrimination law to construe the WLAD. *Kumar v. Gate Gourmet Inc.,* 325 P.3d 193, 197-98 (Wash. 2014).

[7] Prometric acknowledges that Mr. Stewart was entitled to email documents to his attorney.  (*See, e.g.*, Thompson Decl. ¶ 15; Mulford Decl. ¶ 31.)

conduct was not reasonable.  (Reply at 8.)  Indeed, the *Selberg* court observed that where an employee's oppositional activity "so interferes with his job performance that it renders him ineffectual in the position for which he is employed, such conduct is not protected by the statute."  *Selberg*, 726 P.2d at 470.  The court cannot, however, conclude on the record before it that Mr. Stewart's acts were so unreasonable as to render his oppositional activity unprotected as a matter of law.  Although Prometric's managers state that they lost confidence in Mr. Stewart's impartiality and honesty due to his repeated violations of Prometric policy and the warnings issued to him (*see, e.g.*, Thompson Decl. ¶¶ 12, 14; Mulford Decl. ¶ 32), Prometric has not pointed the court to objective evidence that definitively establishes Mr. Stewart's conduct to be "so excessive" as to render him unfit for his employment as an NAE.  *See Selberg*, 726 P.2d at 471 (finding no objective evidence supported a conclusion that plaintiff's oppositional activity was "so excessive" as to make his work performance inadequate, render him ineffective in his position, or cause disruption to employee morale); *c.f. O'Day*, 79 F.3d at 762-63 (finding conduct unreasonable where employee sneaked into his supervisor's office, stole sensitive personnel documents relating to a layoff, and showed them to a coworker who was among those slated for lay-off).  The court concludes that a jury could reasonably find that Mr. Stewart's conduct was not so unreasonable or excessive as to remove his oppositional activity from the protection of the WLAD.

### b.   *Adverse Employment Actions*

An adverse employment action involves a change in employment that is more than an inconvenience or alteration of one's job responsibilities.  *Boyd v. State, Dep't of Soc.*

1    & *Health Servs.*, 349 P.3d 864, 870 (Wash. Ct. App. 2015) (citing *Alonso v. Qwest*

2    *Commc'ns Co., LLC,* 315 P.3d 610, 617 (Wash. Ct. App. 2013)).  The employee must

3    show that the challenged action is harmful to the point that it would dissuade a reasonable

4    employee from making complaints of retaliation.  *Zhu v. N. Cent. Educ. Serv. Dist*, 404

5    P.3d 504, 511 (Wash. 2017).  Whether a particular employment action would be

6    considered adverse by a reasonable employee is a question of fact for the jury.  *Boyd*, 349

7    P.3d at 870.

8            The parties do not dispute for the purposes of this motion that Prometric's decision

9    to terminate Mr. Stewart was an adverse employment action.  (Resp. at 16; *see* Mot. at 20

10   n.18.)  Mr. Stewart, however, contends that the July 25 verbal warning and suspension

11   and the August 24 final written warning were also adverse actions within the meaning of

12   the WLAD's retaliation provision.[8]  (Resp. at 16-18.)  Washington courts have found that

13   disciplinary notices, corrective action letters, other sanctions less severe than a

14   termination or demotion may be adverse employment actions under the WLAD.  *See,*

15   *e.g., Boyd*, 349 P.3d at 870 (ruling that jury could find that a two week suspension,

16   written reprimand, removal from employment responsibilities, and reports to DOH and

17   the police, taken together, constituted adverse employment action); *Alonso*, 315 P.3d at

18   617 (loss of van and cell phone benefits); *Burchfiel v. Boeing Corp.*, 205 P.3d 145, 152

19   (Wash. Ct. App. 2009) (corrective action memo).  Based on the foregoing authorities, the

20   court agrees with Mr. Stewart that a jury could reasonably determine that the verbal

21

22           ───────────────────────────
             [8] Prometric does not respond to this argument.  (*See generally* Reply.)

1    warning, suspension, and written warning are adverse employment actions within the

2    meaning of the WLAD's retaliation provision.

3         2.    Legitimate Nonretaliatory Reason

4         Prometric has met its burden of production at the second step of the *McDonnell*

5    *Douglas* framework to articulate a legitimate retaliatory reason to fire Mr. Stewart:  it

6    contends that it fired him not for complaining about discrimination against Somali

7    test-takers, but rather because he lied about having destroyed all copies of the pass-rate

8    data and for forwarding internal emails to external email addresses.  (*See, e.g.*, Thompson

9    Decl. ¶ 14; *id.*, Ex. B (September 26, 2018 Termination Request); *id.*, Ex. D (October 1,

10   2018 email from Ms. Thompson to Mr. Stewart); Mulford Decl. ¶¶ 30-32.)

11        Although Mr. Stewart argues that Prometric has failed to meet its burden on the

12   second step (*see* Resp. at 19-21), that burden is not heavy.  Rather, Prometric's burden is

13   only to articulate a legitimate, nonretaliatory reason for taking adverse action against Mr.

14   Stewart, supported by evidence that, taken as true, would permit the conclusion that there

15   was a nonretaliatory reason for the termination.  *See Mackey,* 12 Wn. App. 2d at 571.  It

16   has done so here.

17        3.    Pretext

18        An employee may satisfy the pretext step of the *McDonnell Douglas* framework

19   by offering sufficient evidence to create a genuine issue of material fact that the

20   defendant's articulated reasons (1) had no basis in fact, (2) were not really motivating

21   factors for its decision, (3) were not temporally connected to the adverse employment

22   action, or (4) were not motivating factors in employment decisions for other employees in

1    the same circumstances.  *Scrivener*, 334 P.3d at 547.  Alternatively, the employee can

2    satisfy the third *McDonnell Douglas* step by showing that although the defendant's stated

3    reason is legitimate, discrimination nevertheless was a substantial factor motivating the

4    employer.  *Id.* at 546.

5         The court agrees with Prometric on one point:  Mr. Stewart cannot meet his

6    burden to establish pretext based on his assertion that sending external emails was not a

7    factor in other Prometric employment decisions.  (*See* Reply at 10-12.)  Although Mr.

8    Stewart has identified multiple instances where other employees sent internal emails to

9    external accounts (*see, e.g.*, O'Laughlin Decl. Exs. K-71-72), he has not identified

10   evidence that shows that Prometric was aware of that conduct at the time it occurred (*see*

11   *generally* Resp. at 11-12).

12        Nevertheless, in light of the low bar for the amount of evidence required for a

13   plaintiff to defeat summary judgment in the employment discrimination context, *see*

14   *Weil*, 922 F.3d at 1002, the court is satisfied that Mr. Stewart has met his burden to show

15   a genuine issue of material fact regarding whether Prometric's stated reasons for

16   disciplining him and terminating his employment were pretextual.  Mr. Stewart has

17   produced evidence that Prometric issued its July 25 verbal warning in response to Mr.

18   Stewart's direct complaint to DOH about Somali pass rates, even though there is no

19   written policy prohibiting such complaints and even though Ms. Lawson acknowledges

20   that complaints can be made to DOH.  (*See* Mulford Dep. at 36:11-13; Lawson Dep. at

21   31:8-14, 22-25.)  Then, shortly after Mr. Stewart sent his August 14 email reiterating his

22   concerns about the Somali translation, Prometric issued a final written warning directing

Mr. Stewart to cease gathering evidence relating to his concerns about discrimination and to destroy what evidence he had.  (O'Laughlin Decl. Ex. K-20 at 1.)  Prometric did not speak to Mr. Stewart about whether he had in fact continued to gather evidence before it issued the final written warning, and it involved Ms. Mulford in the disciplinary process even though she does not normally participate in employee discipline.[9]  (*See* Mulford Dep. at 14:14-16, 43:25-44:5; Thompson Dep. at 48:20-23.)  Ultimately, Prometric fired Mr. Stewart for sending internal emails and candidate pass-rate information to his personal email account (an activity that a jury could find was protected under the WLAD, *see supra*) and for being dishonest about destroying the pass-rate document (even though Mr. Stewart did not understand that Prometric expected him to go through his email and delete all instances of the pass-rate document).  (*See* Thompson Decl. Exs. B & D; Stewart Dep. at 193:11-194:2.)

This evidence, taken in the light most favorable to Mr. Stewart, shows that the conduct for which Prometric disciplined and fired Mr. Stewart is inextricably intertwined with his opposition to what he viewed was discrimination against Somali test-takers. Although Prometric recites a litany of what it asserts are undisputed facts supporting summary judgment in its favor (*see* Reply at 1-5), the court cannot, on the record before it, conclude as a matter of law that Mr. Stewart's protected activity was not a substantial factor in Prometric's decisions to discipline or terminate him.  Instead, it will be the

---

[9] A jury could also view statements by Prometric's managers as evidence that the final written warning was motivated by Prometric's desire to get Mr. Stewart to "drop the issue" of the Somali translations.  (*See, e.g.*, Mulford Dep. at 46:6-49:13.)

1    jury's task to untangle the competing inferences that can be drawn from the evidence and

2    determine whether Prometric acted with retaliatory intent.  Therefore, the court DENIES

3    Prometric's motion for summary judgment (Dkt. # 24).

4                              **IV.    CONCLUSION**

5           For the foregoing reasons, the court DENIES Prometric's motion for summary

6    judgment (Dkt. # 24).

7           Dated this 13th day of January, 2021.

8

9    _____

10   JAMES L. ROBART
     United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 25